# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
## Savannah Division

FILED
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By dreese at 5:03 pm, Mar 28, 2016

| | |
|---|---|
| In the matter of: ) | Chapter 7 |
| ) | |
| KENNETH R. HARDIGAN, ) | |
| ) | Number 12-40484-EJC |
| *Debtor.* ) | |
| ) | |
| K.A.P., INC., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | Adversary |
| v. ) | |
| ) | Number 12-04069-EJC |
| KENNETH R. HARDIGAN ) | |
| ) | |
| *Defendant.* ) | |

### MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In 2006 the Defendant, Dr. Kenneth R. Hardigan ("Defendant" or "Debtor"), purchased a home located at 1 Bluff Drive in the Isle of Hope district of Savannah, Georgia (the "Property"). In September 2007 he contracted with the Plaintiff, K.A.P., Inc. ("K.A.P."), to make substantial renovations to the home (the "Project"). The Project was originally budgeted for $1,092,943 and the Debtor borrowed $1,095,000 from SunTrust Bank for this purpose. Over the succeeding months, the Debtor requested numerous changes and upgrades to the plans which increased the overall cost. By the end of October, 2008, the Debtor's construction loan proceeds were exhausted but work remained to be done. He was able to pay only $206,000 toward a total October, 23 2008 invoice of $238,866.00. The Debtor then sought from K.A.P. an estimate of the cost to finish the Project so that he could obtain additional funding from SunTrust. K.A.P.

provided an estimate of $314,417.00, and in late December 2008 the Debtor obtained a commitment from SunTrust for an unsecured loan of $350,000.00. After assuring K.A.P. that he had the necessary funds and that he would pay them from these loan proceeds, the Debtor asked K.A.P. to continue the project to completion. Based on these assurances that the Debtor would apply the SunTrust loan proceeds to the unpaid invoices, K.A.P. continued to work on the renovations, but by February, 2009, the final unpaid balance was well over $500,000.00. Based in part on some disputes over the accuracy of the invoices, the Debtor was unable or unwilling to pay this balance. On May 18, 2009, K.A.P. placed a materialmen's lien on the Property in the amount of $544,109.93, and then on September 24, 2009 filed suit in the Superior Court of Chatham County, Georgia (Civil Action No. CV09-2276-AB) for breach of contract. There were no allegations of fraud or other tort claims asserted by K.A.P. against the Debtor in the Superior Court action.

After the Debtor filed for relief under Chapter 7 on March 7, 2012, K.A.P. initiated this adversary proceeding to determine the dischargeability of its debt pursuant to 11 U.S.C. § 523. (Adv. Dckt. 1). On January 22, 2013, this Court entered an order abstaining from further proceedings on the Debtor's liability to K.A.P., and directed the parties to continue their pending litigation in the Superior Court of Chatham County, Georgia. (Adv. Dckt. 13). A jury verdict for $400,000.00[1] was entered in that state court action in favor of K.A.P. and affirmed

---

[1] The jury also awarded $112,221.00 in attorney's fees, which were included in K.A.P.'s Amended Proof of Claim. (Claims Register 2-3). On July 7, 2015, the chapter 7 Trustee filed an objection to K.A.P.'s Amended Proof of Claim arguing that the award of attorney's fees represents post-petition legal costs and interests to which K.A.P. is not entitled. (Dckt. 233). Subsequently, K.A.P. filed an Amended Proof of Claim which only included the $400,000.00 jury verdict for damages. (Claims Register 2-4).

AO 72A
(Rev. 8/82)

2

by the Georgia Court of Appeals[2]. K.A.P. now seeks to have its judgment held non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) on the grounds that the Debtor's misrepresentation regarding use of the SunTrust loan proceeds prompted K.A.P. to incur additional costs[3]. (Adv. Dckt. 64).

The matter is before the Court on Defendant's Motion for Summary Judgment ("Motion") (adv. dckt. 76). For the reasons outlined below, the Court will GRANT the Defendant's Motion for Summary Judgment.

## I. JURISDICTION

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I) (providing that core proceedings include "determinations as to the dischargeability of particular debts"). In accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. The Underlying Dispute

In 2006, the Debtor purchased the home located at 1 Bluff Drive, which was built in the 1940's and in need of extensive renovations. On September 5, 2007, the parties entered into a verbal agreement in which K.A.P. would perform the renovations to the Property. (Adv. Dckt. 86-18). The parties never memorialized their verbal agreement in the form of written

---

[2] *One Bluff Dr., LLC et al. v. K.A.P., Inc.*, 330 Ga. App. 45 (2014).

[3] On October 30, 2015, Plaintiff withdrew its claim for relief brought pursuant to 11 U.S.C. §523(a)(6). (Adv. Dckt. 87).

contract. Because the Debtor and K.A.P.'s principal had a previous working relationship, K.A.P. agreed to perform the renovations at cost and on a "time-and-materials" basis. (Adv. Dckt. 86-19). After receiving bids from subcontractors, K.A.P. presented the Debtor with a "Base Bid" summary estimate totaling $1,092,943.00. *Id.* The Debtor took this Base Bid amount to his lender, SunTrust Bank, and initially borrowed $1,095,000.00 to pay for the Project. (Adv. Dckt. 76-2, p. 6, lines 16-22).

Throughout the course of the Project, K.A.P. would submit invoices to the Debtor for payment, along with a schedule of values which was broken down by category and showed the contract amount, the amount previously billed, the work done for that period, the total amount billed, the percent complete and the balance to finish. For a majority of the Project, the Debtor timely paid each invoice submitted by K.A.P. In fact, as of the October 23, 2008 invoice, K.A.P. had submitted invoices totaling $1,050,345.00, of which the Debtor paid $1,017,479.00. The Debtor was only able to pay $206,000.00 of the $238,866.00 invoice submitted on October 23, 2008 because the funds in his construction account had become depleted. (Adv. Dckt. 76-4, p.44). Upon receiving this invoice, the Debtor contacted K.A.P. to request an estimate of how much additional money it would take to complete the Project, so that he could take this estimate to SunTrust and borrow the necessary additional funds.

On December 12, 2008, K.A.P. prepared a memorandum for the Debtor which indicated the total amount of extras/changes incurred was $314,417.00. (Adv. Dckt. 76-4, p. 51). This figure represented the estimated amount to complete the Project, and was used by the Debtor to obtain an unsecured, six-month $350,000.00 loan from SunTrust (the "SunTrust Loan") from which to pay K.A.P. for any overdue invoices and the costs required to complete the Project. On December 23, 2008, the Debtor informed K.A.P. of SunTrust's verbal

commitment to provide the necessary funding. At that time, K.A.P. resumed construction on the Project until its completion. The Debtor received the $350,000.00 from SunTrust on or about January 21, 2009. (Adv. Dckt. 86-6). K.A.P. sent the Debtor a final invoice for $234,482.00 on February 5, 2009[4]. (Adv. Dckt. 76-4, p. 49). Then, on April 1, 2009, K.A.P. sent the Debtor a memorandum entitled, "Changes and Extras incurred after the September 7th budget number of 1.2 Million that was given to you," which provided that the amount of extras incurred totaled $314,417.00[5]. (Adv. Dckt. 76-4, p. 56).

To summarize, the Debtor received the following estimates or invoices from K.A.P. beginning in October 2008:

| Invoice Date | Invoice Amount | Work This Period | Total Amount to Date | % Complete | Balance to Finish |
|---|---|---|---|---|---|
| October 23, 2008 | $238,856.00 | $238,856.00 | $1,062,745.00 | 97% | $54,398.00 |
| December 11, 2008 | $276,761.83 | N/A | N/A | N/A | N/A |
| December 12, 2008 Memo | $314,417.00 | N/A | N/A | N/A | N/A |
| February 5, 2009 | $234,482.00 | $234,482.00 | $1,297,227.00 | 119% | -$204,284.00 |
| April 1, 2009 Memo | $314,417.00 | N/A | N/A | N/A | N/A |

The Debtor asserts he initially refused to submit any of the funds received from the SunTrust Loan to K.A.P. until they could provide documentation supporting the $314,417.00

---

[4] The February 5, 2009 invoice listed an amount of $234,482.00 owed for "Contract Revenue." (Adv. Dckt. 76-4, p. 49). It is was initially unclear whether this figure represented the final amount owed by the Debtor for the entire Project or only represented the amount of costs incurred by K.A.P. since the previous December 11, 2008 invoice.

[5] This amount is identical to the estimated cost to complete the Project provided in K.A.P.'s December 12, 2008 memorandum.

estimate provided in the December 12, 2008 memorandum. According to the Debtor, the $234,482.00 February 5, 2009 invoice only added to the confusing billing from K.A.P. The Debtor claims he was unsure whether the December invoice was a mistake and K.A.P. was seeking the amount of the February invoice plus the remaining balance from the October invoice, or if they were actually seeking a total of all three invoices. Ultimately, the Debtor contends that he did not make any payments to K.A.P. because he was unable to reconcile these billing discrepancies and K.A.P. could never provide the information necessary to do so. This ultimately led to K.A.P. filing the $544,109.93 contractor's lien against the Property on May 18, 2009. (Adv. Dckt. 76-12). After K.A.P filed its contractor's lien, the Debtor returned most of the $350,000.00 to SunTrust Bank[6].

B. <u>K.A.P.'s Allegations</u>

K.A.P. alleges that the Debtor misrepresented his intent to pay K.A.P. for its work out of the SunTrust Loan. K.A.P. does not dispute that the Debtor obtained the SunTrust Loan for the express purpose of compensating K.A.P. for unpaid invoices and for completion of the Project. However, K.A.P. claims that it was the Debtor's clear intent to *condition* such payment upon whether he was successful in obtaining long-term financing to pay back the unsecured, short-term SunTrust Loan. K.A.P. asserts that it was never made aware of this condition and would not have agreed to continue work on the Project if it had been aware of the condition. Accordingly, K.A.P. asserts that this failure to notify K.A.P. of the condition to payment constitutes intentional concealment of a material fact, rendering the $350,000.00 received by the

---

[6]According to K.A.P.'s Amended Complaint, the Debtor spent roughly $80,000.00 of the SunTrust Loan on other unrelated expenses before returning the balance of the loan to SunTrust Bank. (Adv. Dckt. 64, ¶ 40).

Debtor to compensate K.A.P. as a non-dischargeable debt[7] for services obtained by false pretenses and false representations.

K.A.P. also disputes the Debtor's claim that his refusal to pay the funds from the SunTrust Loan was based on K.A.P.'s inability to support its billings with "back-up" documentation. To support this contention, K.A.P. provided affidavits of its employees who maintain that each and every billing was supported by documentation of subcontractor and supplier expenses because it was K.A.P.'s customary billing practice to do so. In addition, K.A.P. contends that the Debtor did not make a request for documentation until well after he had occupied the home. Specifically, K.A.P. claims that the Debtor did not make a request until he received a lower-than-expected appraisal of the home in April 2009. In addition, K.A.P. asserts that the timing of the requests for documentation provides further evidence of the Debtor's intent to condition payment to K.A.P. upon his ability to obtain long-term financing.

C. Debtor's Dispute over Billings

In contrast to the Plaintiff's allegations of fraud and intentional concealment of a material fact, the Debtor characterizes the failure to pay K.A.P. as a billing dispute. The Debtor contends that he had the ability to pay K.A.P. for any reasonable and justified charges up to $350,000.00, but decided to withhold payment when it became clear that K.A.P. had misrepresented the amount of needed to finish the Project and could not explain their billing discrepancies.

---

[7] Although K.A.P. filed a claim for the entire $400,000.00 judgment obtained in the state court litigation, the instant non-dischargeability action is limited to the $350,000.00 proceeds of the SunTrust Loan.

The Debtor contends that he did not initially dispute any of K.A.P's billing because the representations in K.A.P.'s invoices and schedule of values made it appear as though the Project was on budget. For example, the August 11, 2008 invoice represented that the roofing and rough carpentry were 100% complete. *See* Adv. Dckt. 76-1, ¶ 10. The Debtor argues if there had been any changes with regards to these areas, K.A.P. would have submitted a written change order or reflected actual changes to the contract price on the schedule of values, as it was their customary practice to do so. *Id.* at ¶ 6, 8. The Debtor contends that he never received a written change order[8], nor were changes listed in the schedule of values. *Id.* at ¶ 10.

After depleting the funds in his construction account in October 2008, the Debtor asked K.A.P. to provide an estimate of how much it would cost to complete the Project so that he could borrow the additional amount. In early December, the Debtor contends that K.A.P. provided a verbal estimate of $300,000.00 to complete the Project, which was confirmed by K.A.P. in its December 12, 2008 Memo. (Adv. Dckt. 76-1, 20, 27). The Debtor used this estimate to obtain the SunTrust Loan. At that time, the Debtor contends he intended to pay K.A.P. any legitimate amounts owed under the contract. (Adv. Dckt. 76, p. 4). However, the $300,000.00 estimate was higher than the Debtor expected because the October 23, 2008 invoice indicated the project was 97% complete. *Id.* In order to reconcile this discrepancy, the Debtor contends that he asked K.A.P. for all of the subcontractor and supplier invoices. *Id.* While attempting to obtain these invoices, K.A.P. sent the Debtor an additional invoice dated February 5, 2009 in the amount of $234,482.00. (Adv. Dckt. 76-1, 34).

---

[8]It is undisputed that K.A.P. never submitted a written change order to the Debtor for alleged changes/extras to the contract price throughout the course of the Project. (Adv. Dckt. 76-3, p. 4).

The Debtor further contends that the February 5, 2009 invoice made it even more difficult to reconcile K.A.P.'s billing discrepancies. The amounts listed as changes/extras were different from those listed in the December 2008 and April 2009 memorandums. *See* Adv. Dckt. 76-1, ¶ 45. In fact, the amount charged for some items actually decreased. In addition, the schedule of values showed that the Debtor was billed for work that was never performed by K.A.P., including hardwood flooring and concrete staining. *Id.* at ¶ 47.

## III. CONCLUSIONS OF LAW

### A. Standard For Summary Judgment

Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7056 makes Federal Rule of Civil Procedure ("Federal Rule") 56 applicable to adversary proceedings in bankruptcy. Under Federal Rule 56, summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, a dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden to prove that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where the non-moving party bears the burden of proof at trial, the burden can be satisfied if the moving party demonstrates the absence of evidence supporting the non-moving party's case. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259 (11th Cir. 2004). In determining whether the movant has met its burden, the Court must examine the evidence and make all reasonable inferences in favor of the non-movant. *In re Pony*

*Express Delivery Servs., Inc.*, 440 F.3d 1296, 1300 (11th Cir. 2006). Once this burden is met, the non-moving party cannot merely rely on allegations or denials in its own pleadings. Rather, the non-moving party must present specific facts that demonstrate there is a genuine dispute over material facts. Fed. R. Civ. P. 56(c); *See Celotex*, 477 U.S. at 324.

B. 11 U.S.C. § 523(a)(2)(A)

One of the principal forms of relief the bankruptcy process affords debtors is a discharge of debt. However, 11 U.S.C. § 523 provides carefully drawn exceptions to the dischargeability of a debtor's debts, which must be construed strictly against the creditor and liberally in favor of the debtor "to give effect to the fresh start policy of the Bankruptcy Code." *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164-65 (11th Cir.1995). The plaintiff bears the burden to prove by a preponderance of the evidence that his or her debt is non-dischargeable under § 523(a)(2)(A). *Grogan v. Garner*, 498 U.S. 279, 289-91 (1991).

Section 523(a)(2)(A) provides that a debt is excepted from discharge if it is:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. 523(a)(2)(A).

In order to prevail under § 523(a)(2)(A), K.A.P. must show the following four elements of fraud are satisfied: (1) the debtor made a false representation with intent to deceive the creditor; (2) the creditor actually relied on the misrepresentation; (3) the creditor's reliance was justifiable ; and (4) the misrepresentation caused a loss to the creditor. *See HSSM #7 Ltd. P'shp. v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 892 (11th Cir. 1996).

In order to establish the first element, the creditor must prove that the debtor made a false representation, other than an oral statement regarding the debtor's financial condition, with the intent to deceive the creditor. A statement made with "reckless indifference to the truth is sufficient to bar a discharge" under § 523(a)(2)(A). *See Birmingham Trust Nat. Bank v. Case*, 755 F.2d 1474 (11th Cir. 1985). However, a statement of intent to perform an act in the future will not generally form the basis of a false representation unless the creditor can establish that the debtor lacked the subjective intent to perform the act at the time statement was made. *Blosser v. Boggus (In re Boggus)*, 479 B.R. 147, 155 (Bankr. N.D. Ga. 2012). "As distinguished from false representation, which is an express misrepresentation [,] false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression . . . and [i]t is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under § 523(a)(2)(A)." *SunTrust Bank v. Brandon (In re Brandon)*, 297 B.R. 308, 313 (Bankr.S.D.Ga.2002) (internal citations omitted). However, mere concealment of a material fact is not sufficient to prove intent; rather, that concealment must have been made in such a manner as to deceive and mislead. *Id.*

Because the debtor is unlikely to admit that he made a promise without the intent to perform or that he made a false statement or omission with the intent to deceive the creditor, the court is permitted to infer such fraudulent intent from the facts and circumstances of the case. *Bucciarelli*, 429 B.R. at 375-76. However, "if there is room for an inference of honest intent, the question of non-dischargeability must be resolved in the debtor's favor." *In re Callaway*, No. 04-14055-WHD, 2006 WL 6589022, at *19 (Bankr. N.D. Ga. 2006) (quoting *In re Druckemiller*, 177 B.R. 859 (Bankr. N.D. Ohio 1994).

C. <u>False Pretenses</u>

Here, it is undisputed that the Debtor promised to use the $350,000.00 SunTrust Loan proceeds to pay K.A.P.'s then-outstanding invoices and to pay for completion of the renovations. Based upon this promise, K.A.P. agreed to continue work on the Project until its completion. However, K.A.P. alleges that the Debtor, unbeknownst to K.A.P., conditioned use of the SunTrust Loan funds upon his ability to obtain permanent financing and roll the unsecured SunTrust Loan into the loans already secured by the Property. Accordingly, K.A.P. argues, as stated in its response to the motion for summary judgment, that the failure to disclose this condition represents an intentional concealment of a material fact sufficient to constitute false pretenses as set forth in § 523(a)(2)(A):

> Hardigan's misrepresentations regarding his intent to pay KAP for its work out of the SunTrust Consumer Loan, when his clear intent was to condition payment upon whether he was successful in obtaining long-term financing collateralized with the home, constitutes false pretenses that exempt the funds actually received from SunTrust for payment to KAP from dischargeability pursuant to 11 U.S.C. § 523(a)(2)(A). At a minimum, his admitted failure to notify KAP that he had unilaterally, and without notice to KAP, conditioned payment for its work upon the occurrence or non-occurrence of a circumstances clearly beyond the realm of KAP's control- that of his ability to obtain further long-term financing on his home after construction- constitutes intentional concealment of a material fact, rendering the $350,000.00 received by Hardigan from SunTrust for the purpose of paying KAP's past-due invoices and completion of construction as a non-dischargeable debt for services obtained by false pretenses and false representations.

(Dckt. 86, p. 7).

To establish the existence of this alleged condition, K.A.P. relies on the Debtor's deposition testimony where he stated that he intended to pay the SunTrust Loan back with permanent financing from SunTrust. (Adv. Dckt. 86, Ex. G, p. 39). Specifically, the Plaintiff argues that the Debtor's intent to condition payment to K.A.P. can be gleaned from the following deposition testimony of the Debtor:

> Q. Did [the inability to sell the Debtor's former residence at a profit][9] concern you as to how you were going to pay back [the SunTrust Loan]?
>
> A. No.
>
> Q. How did you intend to pay [the funds received from the SunTrust Loan] back?
>
> A. With permanent financing from the bank.
>
> . . .
>
> Q. What in your estimation did [the April 2009 appraisal] have to do with payment to KAP?
>
> A. The only thing I can think of is that at that point [the Debtor's bookkeeper] was still working on the concept of getting long-term financing.
>
> Q. Because without long-term financing KAP wasn't going to get paid?
>
> A. I don't know.

(Adv. Dckt. 86-7, p. 39, 48)[10].

The Court does not draw the same inference from this testimony that the Plaintiff claims. The Debtor stated in his deposition that the permanent financing would be used to pay SunTrust, not to pay K.A.P. There is no evidence that payment to K.A.P. was conditioned upon anything except accurate billing records. As discussed above, the record contains numerous examples of billing discrepancies or inconsistencies. To be sure, the billing dispute was resolved in K.A.P.'s favor as reflected by the jury verdict in the state court litigation. Had the billing dispute not occurred, K.A.P. would have been paid out of the $350,000.00 Suntrust Loan.

---

[9] At the deposition, Plaintiff's counsel inquired about the Debtor's sale of his property located at 2 Waterside Drive, Savannah, Georgia 31411, which occurred on February 19, 2009 and resulted in less than $10,000.00 net profit to the Debtor.

[10] The deposition testimony actually reveals a lot of confusion regarding this theory of an "undisclosed condition." Throughout the deposition, the Debtor appears to misunderstand Plaintiff's counsel's suggestion that K.A.P.'s payment was conditioned on the Debtor's ability to obtain permanent financing. In any event, the deposition does not support this inference.

Conditioning final payment on accurate billing is not out of the ordinary for a home construction project. Therefore, it cannot be said that the Debtor committed fraud by withholding payment to K.A.P. As a general contractor, K.A.P. should have expected its payment out of the SunTrust Loan to be conditioned upon a final accurate accounting of labor and materials, especially for a project of this magnitude with cost overruns of over $300,000.00. Further, these disputes were perhaps inevitable due to the lack of a contract, which left the parties without the formal dispute resolution mechanisms that appear in standard construction contracts[11].

Accordingly, K.A.P. has failed to present sufficient evidence to create a genuine dispute regarding whether the Debtor failed to disclose a material fact sufficient to constitute false pretenses or false representations as set forth in 11 U.S.C. § 523(a)(2)(A).

D. <u>The Debtor's Intent</u>

For purposes of section 523(a)(2)(A), a failure to fulfill a promise is not sufficient, as it must be shown that the Debtor promised to repay K.A.P. either knowing that he could not, or that he did not intend to perform as agreed. *Boggus*, 479 B.R. at 155. Thus, K.A.P. bears the burden of demonstrating that the promise Debtor breached was actually made with fraudulent intent from the inception of the promise, and for purposes of this motion must show the existence of a dispute based on factual evidence.

Here, K.A.P. has also failed to create a genuine dispute regarding the Debtor's intent at the time he promised to pay K.A.P. for its outstanding invoices and for the costs to

---

[11] The American Institute of Architects' ("AIA") standard construction contract provides that claims by either the owner or contractor must be referred to an initial decision maker, generally the architect. AIA Document A201™ - 2007 § 15.2.1. This initial decision maker will render an initial decision approving or rejecting the claim. *Id.* at § 15.2.5. The initial decision is final and binding on the parties but subject to mediation, and if the parties fail to resolve their dispute through mediation, to binding dispute resolution. *Id.*

complete the Project. There is no evidence in the record that the Debtor promised to compensate K.A.P. knowing that he could not, or that he did not intend to perform. To the contrary, the evidence tends to show that the Debtor had the intention of paying K.A.P. at the time he made the promise. After the Debtor's construction account became depleted in October 2008, he began making financial arrangements to cover the cost overruns. In November 2008, the Debtor obtained a $314,417.00 estimate from K.A.P. for the additional costs necessary to finish the Project. He then took this estimate to SunTrust in order to obtain a $350,000.00 loan, which he did in fact secure in January 2009. Had the Debtor harbored an undisclosed intent to not pay K.A.P. at all, there is no reason why the Debtor would have made substantial efforts to secure the unsecured SunTrust Loan.

The Debtor's subsequent decision to withhold payment to K.A.P., whether it was due to a legitimate billing dispute or, as Plaintiff contends, because he realized that he would not be able to obtain the financing necessary to repay the unsecured SunTrust Loan, is irrelevant. As stated above, the analysis of intent under § 523(a)(2)(A) focuses on a debtor's intention to perform at the inception of the promise, and this remains the case even if his subsequent failure to fulfill the promise was intentional. *Boggus*, 479 B.R. at 155. As reflected in the Table above, it was not until February, 2009 that the invoices and statements sent by K.A.P. revealed that the $314,417.00 estimate was substantially less than the total being billed. There is no evidence, and no inference to be drawn, that the Debtor intended to manufacture a billing dispute as an excuse not to pay as he promised he would or that he harbored any belief that the billings were incorrect at the time he made the promise in December 2008.

E. Justifiable Reliance

In determining justifiable reliance, the court applies a subjective test to determine whether the creditor justifiably relied on a debtor's false statements. This requirement is not as exacting as the requirement of reasonable reliance. *See Field v. Mans*, 516 U.S. 59 (1995). Accordingly, the Court need not consider what a reasonable man would do or "apply a community standard of conduct" to each case. *Id.* at 70-71. In conducting this analysis, the "court examines the 'particular qualities and characteristics of the plaintiff and circumstances of the particular case.'" *In re Sampson*, 319 B.R. 256, 261 (Bankr. M.D. Fla. 2003) (quoting *In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995).

If the Court were to have found that the Debtor obtained services from K.A.P. by false representations and with the requisite fraudulent intent, the evidence presented by K.A.P. would be sufficient to create a genuine dispute regarding K.A.P.'s reliance on such false representations. A long standing friendship or close personal relationship weighs heavily in favor of finding reasonable reliance. *In re Spar*, 176 B.R. 321 (Bankr. S.D.N.Y. 1994). It is undisputed that the Debtor was familiar with K.A.P. and its principal from work they had previously performed for the Debtor's cardiology practice. This long-standing relationship is further evidenced by K.A.P.'s willingness to provide general contracting services for the Project at cost. Presumably, in all of its previous dealings with the Debtor, K.A.P. had been able to rely on the representations made by the Debtor. Accordingly, K.A.P. would have no reason to believe that the Debtor would promise to compensate K.A.P. for its overdue invoices and for the costs to complete the Project with the fraudulent intent of never fulfilling such promise.

F. <u>Damages</u>

Again, the Court did not find that the Debtor obtained services from K.A.P. by false representations and with the requisite fraudulent intent. However, if those elements were found in this case, there is sufficient evidence to create a genuine dispute whether the Debtor's alleged misrepresentations caused a loss to K.A.P. It is undisputed that K.A.P. agreed to proceed with completion of the Project after the Debtor promised to obtain an additional loan from SunTrust to cover the cost overruns. After the Debtor informed K.A.P. that he had obtained the SunTrust Loan, K.A.P. continued work on the Project until its completion. However, K.A.P. provided sworn affidavits from K.A.P.'s project manager which stated that the project manager would have never continued work on the Project had he been aware that K.A.P.'s payment was tied to the Debtor's ability to obtain permanent financing. (Adv. Dckt. 86, Ex. C, Griffin Affidavit, ¶ 14). Accordingly, K.A.P.'s reliance on the Debtor's alleged misrepresentations would have been the cause for K.A.P. to incur the additional costs necessary to complete the Project.

G. <u>Conclusion</u>

This Court finds that K.A.P. did not present factual evidence sufficient to create a genuine dispute regarding whether the Debtor obtained money or services by false pretense or false representation. K.A.P. also failed to created a genuine dispute regarding the Debtor's intentions when he promised to compensate K.A.P. for its overdue invoices and for completion of the Project at the time such promise was made. Therefore, K.A.P. cannot prove all of the elements of § 523(a)(2)(A), and thus K.A.P.'s request to have its debt declared non-dischargeable under this Code section must be denied. Hence, the Court concludes that entry of

summary judgment in favor of the Debtor is appropriate. A separate order will be entered contemporaneously with this Opinion.

Dated at Savannah, Georgia, this 28th day of March, 2016.

_____
Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia